PATRICK E. GRANFIELD, administrator, *vs.* HENRY HERLIHY.

Hampden.     November 25, 1947. — January 30, 1948.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & WILLIAMS, JJ.

*Negligence,* Motor vehicle.

Evidence at the trial of an action for causing conscious suffering and the death of one who, in assisting the defendant in his efforts to start his stalled automobile and to keep it going, had been sitting in a hazardous position on the fender of the automobile and pouring gasoline into the carburetor, and who fell from the fender when flames burst upward from the gasoline and the defendant suddenly stopped the automobile, did not warrant a finding that the defendant was under a duty to warn either as to the obvious hazard of riding on the fender or as to the result likely to follow from pouring gasoline on heated metal.

TORT. Writ in the District Court of Springfield dated September 12, 1942.

On removal to the Superior Court, the case was tried before *Broadhurst,* J.

In this court the case was submitted on briefs.

*E. S. Searle,* for the plaintiff.

*M. J. Donovan,* for the defendant.

WILLIAMS, J. This is an action of tort for the conscious suffering and death of the plaintiff's intestate, Quentin Charles Epaul, resulting from an accident on Roseland Street, Springfield, on May 20, 1942. The jury returned a

verdict for the plaintiff on each of the two counts of the declaration, and later the judge under leave reserved entered verdicts for the defendant. The plaintiff has excepted.

Except for two matters, the story of the accident must be gleaned from the following testimony of the defendant, who was called as a witness by the plaintiff. The defendant was employed by his brother Timothy collecting empty barrels. The decedent had formerly worked for Timothy off and on but had not been employed by him for about six months. On the morning of the accident the decedent had ridden with the defendant collecting barrels in a truck equipped with a V eight motor. After dinner the defendant went out alone, and while about a quarter of a mile away from his place of business on Roseland Street the truck "went dead." The defendant attempted to flood the carburetor by pushing the choke back and forth. The carburetor was located at the base of the V formed by two banks of four cylinders each. "He knew that if you flooded the carburetor the gas would run out. He had seen it done. He had done it himself before lots of times. If you look at the carburetor you can see the gasoline coming out of it. If the gasoline ran out of this carburetor it would run down the block where he supposed it would evaporate" — it would run down into the bottom of the V, the flat place between the two banks of cylinders. The flat place was about four inches wide. It was under the carburetor. If the carburetor was flooded the gasoline would run out of it onto that flat place. The flat place "gets as hot as the rest of the motor." After a time he left the truck and went to get some gasoline. (From the testimony of another witness the jury could find that he also called on the decedent and told the latter that he was having trouble with the truck. The decedent then went with him.) The defendant then primed the engine with gasoline. He took off the cleaner or filter on top of the carburetor. It left a round hole about two inches in diameter. He poured gasoline into that hole; just enough to fill it. He then got into the cab and pressed the starter button. The engine started and then stopped. He poured in more gasoline and started the engine again. It ran for a

second or two and then stopped. He did this several times. Meanwhile the decedent was standing near the truck. The latter suggested that he, the decedent, take the can of gasoline and sit on the fender. The defendant gave him the can of gasoline and got into the cab behind the wheel. The defendant waited until the decedent poured "a little gas into" the carburetor and then started the motor. This was done several times. "We finally got the car into motion." The decedent was on the right front fender with the can of gasoline. "I couldn't see him." The decedent then poured gasoline into the carburetor and the defendant started the motor; the truck would run as long as the gasoline lasted and then stop. It probably did not go more then ten or fifteen feet the first time. The motor "stalled all the time — it kept stopping." The decedent primed the carburetor with gasoline about ten times and the motor stalled about the same number of times before they were able to get the truck back onto Roseland Street. When the motor stopped the decedent poured gasoline into the carburetor. He did not pour any gasoline into the carburetor when the motor was running. They went about a quarter of a mile in that fashion. When they were on Roseland Street and almost home a "flame came up from the motor. The defendant could not say how far the truck had travelled since the last stop before that happened." The truck was then in motion. The flame did not come up "just about as he stepped on the starter." It went up in the air as high as the rack on the truck — "probably three feet above the cab." At that time the decedent was sitting on the running board. He was sitting on the fender "just riding there." The decedent fell off the truck when "I stopped. I stopped as quick as I could stop. I made a sudden stop. I knew that his seat was precarious. . . . I didn't see him leave the fender. I got out and found the . . . [decedent] half way under the truck." He was between the front wheels but nearer to the right wheel. He had been sitting "a little over half way down the fender toward the cab. There was a bar runs down from the body for him to hang on to — his feet were toward the radiator. He was

sitting looking ahead." His sleeves were burning. His clothes were not burned in any other place.

A witness, who was in a nearby window, testified that she heard a little explosion; that she did not see the decedent fall off the truck; that she saw the truck making an abrupt stop; and that she went outdoors and saw the decedent lying on the roadway. The decedent later died in a hospital from a fracture of the skull.

In riding on the fender and pouring gasoline into the carburetor the decedent was acting for the benefit of the defendant. Whether he volunteered his assistance or was requested to help by the defendant is immaterial. The defendant owed him the duty to exercise reasonable care for his safety. *Woods* v. *Woods,* 295 Mass. 238. *Donovan* v. *Johnson,* 301 Mass. 12. *Lakube* v. *Cohen,* 304 Mass. 156. Included was the obligation to warn him of dangers incident to the work he was performing, which he did not know of and could not reasonably have discovered, and of which dangers the defendant knew or should have known. *Carpenter* v. *Sinclair Refining Co.* 237 Mass. 230. No warning by the defendant as to the obvious hazards of riding on the fender was necessary. *Sullivan* v. *Ridgway Construction Co.* 236 Mass. 75. As to the danger of flame from the motor, the evidence does not show that the defendant possessed any greater knowledge than the decedent. The defendant knew that if the carburetor was flooded the gasoline would run over and down on the motor. The decedent also must have known this. Both doubtless were aware of the general consequences which might result from pouring gasoline on hot metal. If it was negligence for the defendant to attempt to start the motor in the manner indicated it must have been negligence for the decedent to assist the defendant in that attempt. *Perry* v. *Loew's Boston Theatres Co.* 291 Mass. 332. *Hietala* v. *Boston & Albany Railroad,* 295 Mass. 186, 191.

The judge was right in ordering the entry of verdicts for the defendant.

*Exceptions overruled.*